## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 80-6-13 Vtec |

| | |
|---|---|
| Lakehouse Pub & Grille Permit | DECISION ON THE MERITS |

Since about 1931, there has been a restaurant and bar along the eastern shore of Lake Bomoseen in the Town of Castleton, Vermont ("Town"). The restaurant is currently known as the Lake House Pub and Grille and has had that or a similar name for thirty or more years. The current owners of the land on which this restaurant is located—Susan and Frederick Field ("Applicants" or "the Fields")—allowed or directed certain improvements to be made to their restaurant facility without first receiving the necessary zoning permit. When threatened with a zoning enforcement action, the Fields applied for a permit, which was approved by the Town of Castleton Development Review Board ("DRB"). When the DRB issued its approval, Helen and Robert Steele ("Appellants"), who own and reside at the abutting property to the south, appealed the permit approval to this Court.

The parties completed trial preparations, discovery, and mediation. When their efforts did not result in a settlement of their legal disputes, a de novo merits hearing was scheduled. The Court completed a site visit on the morning of the trial and completed the receiving of evidence on that same day, March 19, 2014. This matter came under advisement by the Court when the parties completed their filing of post-trial memoranda on May 15, 2014.

The Court apologizes to the parties for its delay in drafting this Merits Decision, caused, in part, by administrative matters and unanticipated needs. We do not offer these as explanations or excuses; we regret the Court's delay and repeat our apologies to the parties.

Based upon the testimony, exhibits, and other evidence presented and admitted, including that which was put into context by the site visit that the Court conducted with the parties, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

1.       In 2005, Susan and Frederick Field[1] purchased the land and commercial improvements known as the Lake House Pub & Grille ("Lake House").

2.       A restaurant has operated at the Lake House site for eighty or more years.  In fact, a restaurant named the Lake House or a similar restaurant with a different name ("Captain Charlie's") has operated on this site since 1931, well before zoning was first adopted in the Town.

3.       The Lake House sits on a 0.42± acre parcel of land located along the westerly edge of Vermont Route 30 and the easterly shores of Lake Bomoseen ("the Lake"); the water's edge of Lake Bomoseen marks the westerly boundary for this parcel.  The building which hosts the Lake House also hosts an upstairs apartment with two bedrooms.

4.       The Lake House lot is narrow and undersized, resulting in the existing building and improvements encroaching into the setback areas along Route 30 and from the Lake.  The lot also slopes downward from Route 30 to the Lake.  This slope is steep enough in places to make it difficult to walk on the uneven ground.

5.       Across Route 30 is a separate parcel, 0.2± acres in size and also owned by Applicants; that parcel hosts a parking area and a building with a multi-car garage on the ground level and three apartments on the upper level.

6.       Both of Applicants' parcels are located in the Residential 40,000 Sq. Ft. Zoning District ("R 40 District").  Restaurants are not allowed as a permitted or conditional use in the R 40 District.

7.       Applicants' parcels are depicted on annotated copies of the tax map for this area, admitted at trial as Exhibits 5 and 5A.  The Lake House property is identified as Parcel No. 5 on that tax map; the garage/apartment parcel is identified as Parcel No. 4.

8.       Exhibit 5 also depicts the adjacent property to the south, owned by Helen and Robert Steele, identified on the tax map as Parcel No. 8, and four other nearby properties, not used for

---

[1]  Mrs. Field testified at trial that she and her husband had established an operating corporation for the Lake House, named Inn the Field, Inc.  However, because Mrs. Field, in her personal name, is listed as the "applicant" on the permit application form that is the subject of this appeal, we regard Mr. and Mrs. Field, in their personal names, as the applicants in this matter.  See Applicants' Exhibit A.

Lake House related purposes, owned by Applicants; those parcels are identified as Parcels No. 6, 7, 14, and 15.

9. The parties agree and the Court finds that the Lake House was a lawful but nonconforming use in the R 40 District and that the building in which the Lake House is operated was a lawful but non-complying structure at the time of Applicants' purchase in 2005.

10. As of the date of trial, Applicants' use and structure remained nonconforming to the applicable regulations for the R 40 District.

11. In 1996, the prior owners/operators of the Lake House[2] received site plan approval for certain improvements, including a new deck on the northern side of the restaurant. This site plan approval, with attached site map, was admitted at trial as Exhibit 6. The site plan also identifies a total of 39 spaces for vehicle parking or boat slips.[3]

12. In 1999, V & R Corp., through its agent, David Rogers, submitted another municipal permit application for further improvements to the Lake House, including the addition of a 15-foot by 15-foot serving area deck to be attached to the side of the restaurant facing the Lake.

13. On May 11, 1999, the Town of Castleton Zoning Board of Adjustment ("ZBA") granted the permit application; a copy of the ZBA's written decision was admitted at trial as Exhibit 7.

14. The ZBA noted that "Mr. Rogers explained that he wants to build a deck to be a continuation of an existing deck. The ground is uneven and the deck will even out the serving area and reduce the safety risks." Id. It appears from the ZBA decision and trial testimony that the ZBA used Mr. Rogers's explanation in 1999 to justify its approval of his deck request.

15. The ZBA conditioned its 1999 approval by stating that "[n]o musicians will be allowed to play on the deck. A railing will be built around the deck. There will be no increase in seating. It will remain at 68." Id.

16. The photo that was admitted as Exhibit 11 shows the Lake House after the deck was constructed per the ZBA's 1999 approval.

---

[2] In 1996, the Lake House owner/operator was V & R Corp., through its agent, David Rogers. We note that even though other references to this restaurant in 1996 referred to it by a different name (Lake House Restaurant), the site plan attached to Exhibit 6 denotes the facility as "LAKEHOUSE Pub & Grille."

[3] Applicant's permit application was initially denied by the Town of Castleton Zoning Administrator, who noted on the application (Exhibit 6) that the reason for denial was "non-conforming use & site plan approval" was needed from the ZBA.

17. The 1999 ZBA approval represents the last permit approval for the operation of a restaurant on the subject property prior to the approval that is the subject of this appeal.

18. After the 1999 approval, Appellants became concerned and agitated by what they perceived to be a material increase in the level of noise, foul language, and alcohol-fueled activities from the Lake House, particularly by Lake House guests in the area between the building and the Lake.

19. Initially, Appellants were unable to resolve their differences with the owners/operators of the Lake House. Appellants then filed a complaint against the Lake House and its owners in what is now known as the Vermont Superior Court, Civil Division, Rutland Unit. This matter was entitled <u>Helen Steele, Robert Steele, and Helen Wilkins v. V & R Dockside Corp., Lake House, Inc., Rosemary Rogers, Valerie Poremski, and David Rogers</u>, and given Docket No. 339-6-03 Rdcv.

20. Appellants and their neighbor, Helen Wilkins, thereafter settled their dispute with the Lake House owners/operators (Lake House, Inc., and David Rogers) and the owners of the real estate upon which the Lake House sits (V & R Dockside Corp., Rosemary Rogers, and Valerie Poremski). The parties' settlement is memorialized in a written document, titled "Settlement Agreement," a copy of which was admitted at this trial as Exhibit 13.

21. By their Settlement Agreement, Appellants agreed to dismiss their civil action, with prejudice, in return for an agreement by the defendant owners/operators of the Lake House to implement certain noise abatement, reduction, and remediation measures at the restaurant, as recommended by an engineer jointly hired by those parties. In consideration, the Lake House owners/operators agreed to install an eight-foot tall "hard, dense wood" fence along the parties' shared boundary, reduce the odors associated with a commercial dumpster, and take such other measures and operational limitations referenced in ¶¶ 3, 4, and 15 of the Settlement Agreement. <u>Id</u>. at 1–4.

22. The parties also noted in their Settlement Agreement that the defendant owners/operators were the sole parties responsible for fulfilling the operational requirements in ¶¶ 3, 4, and 15 and that the "Other Defendants," that is, those defendants that owned the

real estate upon which the restaurant was located and operated, had no operational responsibility or control over the restaurant.  Id. at 5, ¶ 19.

23.    Pursuant to the parties' agreement, the Settlement Agreement was filed with the Town Of Castleton Zoning Office and recorded in the Town of Castleton Land Records on April 7, 2005 at Book 130, Pages 378—388.

24.    Subsequent to the Settlement Agreement, and especially after the Fields completed their purchase in 2005, Appellants witnessed a measurable reduction in the noise and other interferences stemming from the restaurant operations.

25.    Later in 2005, the Fields acquired the real estate and site improvements from the prior owners, V & R Dockside Corporation, Rosemary Rogers, and Valerie Poremski.  Mrs. Field represented at trial that they specifically did not purchase the restaurant business from the operating corporation: Lake House, Inc.

26.    Applicants thereafter operated the Lake House and completed miscellaneous physical improvements to the property.  They experienced a steady increase in business after completing these improvements.

27.    At the time of Applicants' purchase, the Lake House was operated on a seasonal basis, whereby the Lake House was opened each May and closed in the mid- to late-fall.  After their purchase, Applicants chose to operate the restaurant on a year-round basis.  Their hours of operation are generally from 11:30 AM until closing time in the late evening.

28.    Applicants have operated the Lake House with a maximum capacity of 192 persons: 96 inside the restaurant and 96 on the decks or otherwise outside the restaurant.

29.    Sometime in 2012, Applicants or their son-in-law, Brad Burns, who was then managing the Lake House, caused the following site improvements to be completed on the property:

   A. Existing uneven stone or concrete steps (shown in middle of the Exhibit 16 photo) were covered over with wooden steps of even height, as shown in the Exhibit 3 photo.

   B. Two new decks were constructed between the restaurant and the Lake: the first is attached to the Lake-facing side of the restaurant building (adjacent to the deck the ZBA approved in 1999) and the second closer to the Lake, adjacent to an existing deck or dock.  See Exhibit 3 photo.  The first deck was partially built over an earth area and wooden retaining wall, but also extends past that retaining wall, such that the westerly side of the deck is elevated four or more feet above the ground.  Id.

This second deck covered over an uneven lawn area depicted in the Exhibit 16 photo.[4]

C. A roof that slopes downward, towards the Lake, was also constructed over the new deck and a pre-existing deck attached to the restaurant building.[5] The roof over the two decks measured 42 feet in width by 19 feet, 6 inches, as measured from the building towards the Lake, all as depicted on hand-drawn site plan attached to Applicants' permit application, a copy of which was admitted as Exhibit 1.

D. Applicants and the witnesses they presented at trial were unable to provide the specific dimensions of these new decks or roofs, although their contractor, offered as a witness at trial, conceded during cross-examination that the new decks were in excess of 300 square feet.

E. A bamboo-type half wall was also installed around the exterior of the decks sheltered by the roof. See Exhibit 3.

F. On the top of the bamboo half wall, a shelf was installed for patrons to place their food and drink and upon which patrons could lean. See Exhibit 4 photo.

G. The Lake House operators advertised these improvements as a "Tiki Bar" and encouraged customers to purchase and enjoy drinks and food on the new deck over which the roof was installed. See Exhibit 12 photo.

H. Certain other miscellaneous improvements were also proposed for inside the Lake House, including half doors, one or more "pass-throughs" for bar service, and a new ladder or steps from the basement to the middle floor.

30. Applicants or their restaurant manager completed all of the improvements listed above in ¶ 29 without having first applied for or received a zoning permit authorizing these improvements.

31. The deck attached to the restaurant and the roof over it reduces the setback from Lake Bomoseen from 28 feet to 9 feet. One or both of the additional new decks are wholly within the setback area from the Lake.[6]

32. Prior to these improvements, the existing structures on the Lake House property covered just over 10% of the lot area. After these newest improvements, the structure coverage increased to 13.9% of the total lot.

---

[4] Appellants' home is shown in the background of the Exhibit 16 photo. At the time of this photo (prior to 2005), Applicants or their predecessors had not yet installed the wooden fence between the properties.

[5] This pre-existing deck was constructed after the 1999 ZBA approval.

[6] The required rear yard setback in the R 40 District is 50 feet; that setback is discussed in more detail in our Discussion section, below.

33.     When these un-permitted improvements were brought to the attention of the Town of Castleton Zoning Administrator, he confronted the Lake House manager and advised that if he did not apply for and receive a zoning permit for all of these improvements, the Administrator would issue a Notice of Alleged Zoning Violation ("NOV") against the Lake House.

34.     Applicants thereafter submitted an application to receive an after-the-fact zoning permit to authorize essentially all of their completed improvements.  Their application was admitted at trial as Exhibit 1.

35.     When the DRB approved the pending application, with the exception of the roof over the decks, neighboring Appellants filed an appeal with this Court.  Applicants filed a cross-appeal that presented five legal issues for the Court to consider, including that their proposed deck roof should be allowed.  During the trial, Applicants advised that they no longer wished to assert that the already-built roof over the attached decks should be allowed.  Applicants reported to the Court that they have dismantled and removed the deck roof.

36.     At trial, Applicants suggested conditions in support of their pending application, including the following:

   A. Applicants agreed to remove the roof over the attached decks and to not seek a permit to replace it.[7]

   B. Applicants specifically requested authorization to maintain and use the second deck along the Lake, adjacent to the existing deck or dock.

   C. Applicants also requested an increase in capacity, based upon identified parking and dock slip spaces, to 192 persons who would occupy seats or standing room areas inside the restaurant, on the new decks, and the existing decks and docks. Applicants' capacity calculations are based upon existing parking spaces along the Lake House lot, the garage/apartment lot, a parking area at a public beach to the north, and the boat docking slips along eight docks of up to 40 feet in length that Applicant seasonally maintains in front of the Lake House.

Applicants' suggested conditions are based upon the conditions that the DRB[8] placed upon its approval.  See Exhibit A at 7.

---

[7]  The Court has been advised that since this matter came under advisement, Applicants have, in fact, completed the removal of the roof.

[8]  Sometime prior to 2012, the DRB replaced the ZBA as the municipal panel empowered to hear municipal land use applications and appeals.

**Discussion**

This appeal concerns questions posed by both parties: Appellants, who were the first to appeal from the DRB's decision to conditionally approved most of Applicants' after-the-fact permit requests, and Applicants, who filed a cross-appeal. We will endeavor to address all of the legal issues presented by the parties in their respective Statements of Questions. We begin our analysis with facts and legal determinations that the parties do not dispute: Applicants seek to expand their restaurant business in a zoning district that does not presently allow for such a use and are seeking authority for as-built expansions to the building in which they operate their restaurant, even though their building, prior to these expansions, did not conform to the applicable setback and lot coverage limitations for that zoning district. These facts ultimately represent the major factors in our determinations on the pending application.

I.      **Standard of Review**

First, we summarize the context within which we must evaluate lawful pre-existing non-conforming uses and structures. The entirety of our Municipal and Regional Planning and Development Act (codified at Chapter 117 of Title 24 of the Vermont Statutes Annotated) is premised upon the general purpose of allowing municipalities and other subdivisions of the State to "encourage the appropriate development of all lands in this State." 24 V.S.A. § 4302(a). Municipalities are empowered to establish zoning and other land use regulations that those municipalities determine are appropriate for their communities. 24 V.S.A. Chapter 117. But that authority must respect the pre-existing vested rights that landowners enjoy to continue to use their land, even when subsequently-enacted zoning regulations no longer permit such uses. Such vested rights have led to an acknowledgement of the legality to continue pre-existing nonconforming uses and non-complying structures.

To balance the importance of allowing communities to govern land uses, while respecting the vested rights of land owners, municipalities are authorized to "regulate and prohibit expansion and undue perpetuation of nonconformities." 24 V.S.A. § 4412(7)(A). Here, the Town has chosen to exercise such powers by enacting provisions within the Town of Castleton Zoning Ordinance ("Ordinance") relating to how the enactment of a land use regulation may impact upon pre-existing uses and structures. See Ordinance § 701 ("Nothing

-8-

contained in these Regulations shall require any change in a non-complying structure or a nonconforming use which existed, or was substantially completed by, prior to the adoption of this bylaw and conforms to the regulation then in effect."). While, as a general rule, preexisting nonconforming uses or structures must be allowed to continue, "[o]ne of the primary goals of zoning is to gradually eliminate nonconforming uses because 'they are inconsistent with the purpose of developing use-consistent areas in communities.'" In re Casella Waste Mgmt., Inc., 2003 VT 49, ¶ 9, 175 Vt. 335 (quoting In re Gregoire, 170 Vt. 556, 558 (1999) (mem.)). This recognizes that the "prime purpose behind zoning is to bring about the orderly physical development of a community by confining particular uses to defined areas." Gregoire, 170 Vt. at 558 (citing Vermont Brick & Block, Inc. v Village of Essex Junction, 135 Vt. 481, 483 (1977)). Here the Town has elected not to allow restaurant uses in the R 40 District and has required that buildings be setback a certain distance from roads, property boundaries, and the Lake. The purpose of doing so is to gradually eliminate uses and structures that do not comply with these town-based legislative decisions.

## II.     Appellants' Statement of Questions

### A. Appellants' Question 1

By their Question 1, Appellants ask, "Should the application be denied as constituting an impermissible expansion of non-conforming use?" Pursuant to Ordinance § 701, nonconforming uses that existed prior to the adoption of the current regulations are allowed to continue if they remain in compliance with the regulations then in effect. Likewise, the expansion of such uses is permissible but only upon approval by the DRB and a finding that the use otherwise complies with all provisions of the Ordinance except type of use. Ordinance § 705(A).

Here, the change in use is reflected by an increase in capacity from 68 to 192 persons (96 inside and 96 outside). The undisputed evidence concerning the Lake House reveals that the last permit authorizing improvements was the 1999 permit issued by the ZBA, which specifically limited the restaurant's capacity to 68 persons. See Exhibit 7 at 2. Because this permit condition was never appealed, it became a final condition governing the operation of the Lake House. 24 V.S.A. §§ 4472(d) ("Upon the failure of any interested person to appeal to

an appropriate municipal panel under section 4465 of this title, all interested persons affected shall be bound by that decision . . . and shall not thereafter contest, either directly or indirectly, the decision . . . .").  The fact that Applicants later operated the Lake House to accommodate up to 192 guests does not impact our analysis here, because neither these Applicants nor their predecessors in title sought or received a permit for that expansion.  Therefore although this use was nonconforming, it was not permitted nor was it permissible under the regulations, and our consideration of prior nonconforming uses is limited to only those that lawfully existed at some prior time, per the directives codified in Ordinance § 701.  As noted below in section II.C, the application before the Court did not seek DRB approval for an increase in the capacity of the Lake House and therefore we do not consider whether, absent the other alterations at issue in this appeal, such capacity could be increased pursuant to Ordinance § 705.

Because the specific expansions applied for in the application before the Court do not comply with the Ordinance provisions other than type of use, as discussed in greater detail below, we answer Appellants first Question in their Statement of Questions by stating that Applicants' pending application must be **DENIED**, as it constitutes an unlawful expansion of a nonconforming use.  That determination would normally end our analysis, but to aid the parties, we continue our evaluation of the remaining Questions posed in each Statement of Questions.

B.  Appellants' Question 2

By their Question 2, Appellants ask whether the pending application evidences "an impermissible expansion of a non-conforming structure" and must therefore be denied.  For the reasons stated below, we agree that Applicants' proposed improvements to the Lake House constitute an impermissible expansion of a non-complying structure according to the applicable Ordinance provisions.

Applicants do not propose to expand the building itself, but rather propose to increase the number and square footage of the decks attached or adjacent to the building.  In some instances, the addition of a deck is exempt from the general requirement to obtain a zoning permit.  Specifically, Ordinance § 1021(B) exempts decks that (1) do not extend more than ten feet from "a dwelling structure's sidewall;" (2) is "not closer than ten (10) feet to a property

line, and (3) the square footage of previously constructed and proposed decks will not exceed 300 square feet." Id. The proposed decks are not attached to a "dwelling structure" and extend more than ten feet from the commercial restaurant structure; each of the two proposed decks are less than ten feet from the water's edge of Lake Bomoseen, which marks Applicants' westerly boundary line; and the two pre-existing decks, when combined with either or both of the proposed new decks, far exceed 300 square feet. Thus, the proposed new decks fail to conform to each of the three subsections of Ordinance § 1021.

As the failure to satisfy any one of these three subsections voids the permit exemption, we conclude that Applicants are not entitled to a permit exemption and must conform to all applicable Ordinance provisions, including setback requirements. Structures within the R 40 District must respect a fifty-foot setback from the front and rear boundary lines when proposing new development. Ordinance Article V. The definition for "structures" includes "decks, and other building features." Ordinance Article IX. Furthermore, "setback" is defined as "[t]he distance from a front lot line, side lot line, or rear lot line to a building or other structure, measured to its nearest wall, porch or deck whether enclosed or unenclosed, but not to steps or normal roof overhand." Id. (emphasis added).

The lawfully preexisting nonconforming structure is 29 feet from the westerly boundary line. The deck that Applicants recently attached to the restaurant structure will extend toward Lake Bomoseen such that the setback is reduced to nine feet. The deck, which is even closer to the Lake and adjacent to an existing deck or dock, has been constructed wholly within the fifty-foot setback. These decks violate the setback requirements for the R 40 District and therefore evidence an unlawful expansion of a non-complying structure and cannot be approved. Ordinance § 701. For all these reasons, we answer Appellants' Question 2 by concluding that the proposed decks constitute an impermissible expansion of a non-complying structure and must therefore be **DENIED**.

C. Appellants Question 3

We decline to answer Appellants' Question 3, as it seeks a determination that is not presented by the pending application. Specifically, Appellants seeks a legal determination that Applicants' proposed expansion does not provide for sufficient parking. While the DRB

determined that Applicants may be allowed to host up to 192 people, we see no specific request in the pending application that seeks an increase in the capacity of 68 persons that was established by the ZBA in 1999. Because we have no evidence before us that the application or other pre-hearing notice provided even a hint that a request would be made to increase the capacity from that established in 1999, we believe it was improper for the DRB to consider such a request, and it would be improper for us to consider such a request on appeal. See In re Torres, 154 Vt. 233, 236 (1990) (noting that "whatever the [municipal panel] might have done with an application properly before it, the superior court may also do" but disallowing consideration of something that was not applied for because doing so would violate the requirement to provide public notice of the application that is before the municipal panel). If Applicants desire to increase the capacity of the Lake House beyond that which was permitted in 1999 they must apply and provide public notice for such an application pursuant to Ordinance § 705 which governs applications to expand a nonconforming use.

   D. Appellants' Question 4

   Applicants, by their Question 4, ask whether the pending application should be denied due to the project's "failure to meet setback, coverage and/or dimensional requirements." We have already considered the setback shortcomings of the proposed decks and concluded that those shortcomings require the Court to deny the application. We repeat that conclusion here. As to lot coverage, non-residential development in the R 40 District is limited to coverage of no more than 10% of the total lot size. Ordinance Art. V. The pre-existing structures on Applicants' lot exceeded 10% of the lot area; with these expansions, 13.9% of the lot is now covered with structures of some kind. The addition of the covered deck constituted an increase in lot coverage and therefore another unlawful expansion of the non-complying structure on Applicants' lot. While, "[u]nroofed decks and porches . . . shall not be considered improvements for the purpose of calculating lot coverage," see Ordinance Article IX, at the time of this appeal the deck was covered and constituted an increased violation of the lot coverage maximum. As we have concluded that the permit applications for the expansions must be denied for other reasons we need not answer the question of whether now that the deck is uncovered it is in violation of the Ordinance lot coverage requirements.

E.  Appellants' Question 5

We next turn to Appellants' final Question.  Question 5 asserts an independent basis for denial of the pending application: that the Ordinance requires an applicant to submit "a covenant, restriction, condition, bylaw or state or local law or regulation which limits the occupancy or use" of the proposed structure "within 15 days of the issuance of the permit; otherwise the permit shall be void."  Ordinance § 1022.  Trial testimony revealed that Applicants' predecessors in title to the real estate upon which the Lake House has and continues to operate entered into a Settlement Agreement with those real estate owners and the then Lake House operators.  Because this Agreement was recorded in the Land Records and clearly identifies this land and the commercial development upon it, we understand that the applicable conveyances made in that Agreement run with the land and are enforceable by and against the successors in interest.

The Settlement Agreement was admitted into evidence at trial as Exhibit 13.  To the extent that Ordinance § 1022 governs such a document, we believe that the submission at trial satisfied § 1022.

We were not presented with an additional citation to an Ordinance provision in support of Appellants' Question 5, but we believe that the Settlement Agreement is not the type of restrictive document that § 1022 envisions.  Often times, developers will propose rights of way, bylaws, covenants, or other such restrictive measures on large developments, especially multi-lot developments.  In anticipation of such developments, municipal regulations, such as here, will require disclosure of the covenants and restrictions that a developer proposes for their project.  We understand that Ordinance § 1022 envisions those types of proposed covenants and restrictions being disclosed and made part of a development's approval; we do not yet have experience with this type of regulatory provision being interpreted as referring to settlement agreements between neighbors or other private parties.  While we regret the suggestion that the parties here engage in further litigation, we conclude that this Settlement Agreement is not applicable to Ordinance § 1022 and, should any party or successor in interest to this Agreement wish to enforce it, they must do so through a separate action and not through enforcement of the zoning Ordinance.

-13-

We therefore answer Appellants' Question 5 in the negative and conclude that Applicants' failure to file this Settlement Agreement with their application does not provide an independent basis for denying their application. We next analyze Applicants' Statement of Questions.

III.    **Applicants' Statement of Questions**

By their Question 1, Applicants suggest that they are entitled to a conditional use permit for the reason that their improvements "do not expand the density of the existing structure in this non-conforming, pre-existing structure." We remain unclear as to what "density" this Question references. To the extent it was intended to reflect the density in terms of lot coverage, we answer in the negative, and conclude, as above, that the additional decks increase the non-conformity of this structure, that that increase is unlawful, and that it provides an independent basis for denial of the pending application.

Applicants' Question 2 seeks approval of the roof they constructed over their rear decks. However, Applicants at trial withdrew their request to receive permit authority for that roof and pledged to remove it. The Court has been advised that Applicants have completed that removal work. In any event, we conclude that Applicants' Question 2 is **MOOT**.

Applicants, by their Question 3, appear to suggest that because the lot coverage maximums for the R 40 District were once more than 10% (Applicants' attorney suggested 15% in his questioning of a witness), Applicants should be allowed to expand their lot coverage to up to that greater percentage. Applicants support this assertion by referencing the installation of the Castleton sewer line to the subject property.

We know of no legal foundation for allowing Applicants to cover a greater percentage of their lot, either because of their pre-existing non-conformities or because of the installation of the municipal sewer line. There is no such provision in the Ordinance. Any development in the R 40 District must conform to the established lot coverage maximum of 10% for non-residential uses. The Ordinance does provide for a smaller minimum lot size for uses served by municipal sewer but does not provide for a different lot coverage maximum. Ordinance Art. V. As the lot coverage may not be increased in violation of the current Ordinance lot coverage requirements, regardless of sewer connections, we answer Applicants' Question 3 in the negative.

By their Question 4, Applicants ask whether "the bylaws provide authority to limit the total number of persons involved in the business of the restaurant (including patrons and staff) and of parking spaces, and if so, what conditions should apply." Our analysis here is constrained by the same concerns expressed above in response to Appellants' Question 5: we are not aware that the application and public notice provide any warning of a request to increase the permitted capacity at the Lake House. What is certain, however, is that the Lake House was last permitted for a capacity of 68 persons; that this restaurant operates as a nonconforming use in a non-complying structure; and that for those reasons, expansion of the size of the structure or the volume of the use is unlawful in this zoning district pursuant to Ordinance §§ 701 and 705.

Applicants' Question 5 appears to challenge the authority of the Town, via the Ordinance, to "regulat[e] access to the restaurant from the waterfront or the use of the docks or waterfront, and if so, what conditions should apply to this use." Applicants' regulatory concerns appear misplaced; no party to this appeal, including the Town, proposed a condition that would restrict Applicants or their guests from using the waterfront or their docks. To the extent that Applicants are inferring that dock slips must be used as parking spaces, our response to that query is "no." The Ordinance defines "parking space" as a "defined space, which is at least 20 feet long and nine (9) feet wide, used for the parking of one motor vehicle, with practical access to the road or right of way, and graveled (or paved) sufficiently to provide year round use." Ordinance Art. IX. The Ordinance does not contain any provision that defines or analogizes a dock slip on a lake or water course with a parking space. We decline to create such an analogy here, particularly where the application presented provided no notice of such a request. Applicants' decision to expand a restaurant that no longer conforms to the applicable regulations, in a structure that exceeds the setback and lot coverage maximums, are the sole reasons for a limitation on their use and operation.

We respond to Applicants' Question 6 in a similar fashion; this Question asks whether "the bylaws authorize regulating where food or beverages may be sold, served, or consumed, and if so, what conditions should apply to such use." To the extent that this Question is directed to Applicants' request to be authorized to maintain and use their new decks, we have

-15-

already concluded that those decks represent violations of the R 40 District setback provisions and represent impermissible expansions of a non-complying structure and of a nonconforming use. For those reasons, Applicants' permit request as to the new decks must be denied. We are unaware of any question in the application regarding a change in where sales, service, or consumption may occur, beyond what may have been authorized by the 1999 permit and the lawful, pre-existing uses and structures. Because that legal issue was not presented by the application, we decline to consider it here.

Finally, we address Appellants' Question 7, which asks "[w]hether a denial of a permit condition authori[zing] food and spirits to be served on the North deck constitutes a permitted right of Applicants, given that it was permitted in 1996 and has been used continuously since 1996 for food and beverage service." It appears that this Question was prompted, not by the pending application, but by one of the conditions specifically imposed by the DRB: Condition #6 directed that the "deck at road level, north of the building shall be used as originally permitted and shall not be used to serve food or beverage." Had Applicants not challenged that Condition on appeal, it would have become final and enforceable against them. 24 V.S.A. § 4472(d). However, once that challenge is in place, we consider the pending application anew. 10 V.S.A. § 8504(h).

Applicants appear to agree with the DRB on this issue in at least one regard: whether they are authorized to continue to serve food and beverage on their north deck is governed by the permit that the ZBA issued in 1996, authorizing the construction and use of that deck. The import of that permit, however, is not a legal issue presented to us by the pending application. To the extent that the legal issue was properly before the DRB, it appears that the DRB was exercising its authority to impose conditions upon its authorization of an expansion of a non-complying structure, pursuant to Ordinance § 709(D). The Court is unsure how such a condition could be imposed, as § 709(D) only allows conditions to be imposed upon an authorization to expand a non-complying structure "with conforming use." Ordinance § 709(D)(emphasis added).

We have reached a different set of legal conclusions than the DRB and have denied the pending application. Because of our opposite conclusion, we specifically **STRIKE ALL** conditions imposed by the DRB, rendering this question **MOOT**.

<u>**Conclusions**</u>

For all the reasons expressed above, we do hereby **STRIKE** the approval and all conditions imposed by the Town of Castleton Development Review Board by their decision dated May 25, 2013, and do hereby **DENY** Applicants' application to maintain and use the two new decks on the side of the Lake House Pub & Grille that faces Lake Bomoseen. The Lake House Pub and Grille may continue to be operated as a nonconforming use in a non-complying structure in the manner that existed once the permit issued in 1999.

This completes the current proceedings before this Court. A Judgment Order accompanies this Decision.

Electronically signed on March 19, 2015 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division